

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-15-2000

# West v. Vaughn

Precedential or Non-Precedential:

Docket 98- 1820

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"West v. Vaughn" (2000). *2000 Decisions.* Paper 30.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/30

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed February 15, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 98-1820

NATHANIEL WEST,
        Appellant

v.

DONALD VAUGHN, SUPERINTENDENT of
SCI GRATERFORD; THE DISTRICT ATTORNEY OF
COUNTY OF PHILA.; THE ATTORNEY GENERAL
OF THE STATE OF PA.

On Appeal From the United States District Court
For the Eastern District of Pennsylvania
(D.C. Civ. No. 97-cv-02297)
District Judge: Honorable James T. Giles, Chief Judge

Argued: September 28, 1999

Before: BECKER, Chief Judge, McKEE, and
NOONAN,* Circuit Judges.

(Filed: February 15, 2000)

        ANTHONY C.H. VALE, ESQUIRE
          (ARGUED)
        Pepper Hamilton, LLP
        3000 Two Logan Square
        18th & Arch Streets
        Philadelphia, PA 19103-2799

        Counsel for Appellant
_____

*Honorable John T. Noonan, Jr., United States Circuit Judge for the
Ninth Circuit, sitting by designation.

        MARILYN F. MURRAY, ESQUIRE
          (ARGUED)
        Assistant District Attorney
        DONNA G. ZUCKER, ESQUIRE
        Chief, Federal Litigation
        RONALD EISENBERG, ESQUIRE
        Deputy District Attorney
        Law Division
        ARNOLD H. GORDON

        First Assistant District Attorney
        LYNNE ABRAHAM, ESQUIRE
        District Attorney

        1421 Arch Street
        Philadelphia, PA 19102-1582

        Counsel for Appellees

OPINION OF THE COURT

BECKER, Chief Judge.

In Cage v. Louisiana, 498 U.S. 39 (1990) (per curiam), the Supreme Court taught that criminal convictions based on jury instructions that equate reasonable doubt with substantial doubt and grave uncertainty may suggest a lower standard of proof than that required by the Due Process Clause of the Fourteenth Amendment. In this state habeas corpus case arising under 28 U.S.C. S 2254, petitioner Nathaniel West claims that the jury charge in his Pennsylvania state court murder trial violated Cage, and that his counsel was ineffective for failing to raise the issue at trial and on appeal. This is West's second habeas corpus petition, his first having been filed before the Cage ruling. The District Court dismissed his latest filing for running afoul of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996), insofar as AEDPA mandates that a new rule of law can be the basis of a successive petition only if it has been "made retroactive to cases on collateral review" by the Supreme Court. See 28 U.S.C. S 2244(b)(2)(A).

2

West's appeal requires that we consider the meaning of AEDPA's retroactivity requirement. The District Attorney urges a restrictive reading, limiting the "made retroactive" exception to situations in which the Supreme Court has explicitly stated that a new rule of law is to be applied retroactively or has actually applied the rule in a retroactive manner. We conclude, however, that the statutory language is not so narrow. AEDPA's text does not restrict retroactive rules to those "held retroactive" or "applied retroactively" by the Supreme Court, but rather employs the more general term "made retroactive." At the time Congress enacted AEDPA, prevailing Supreme Court precedent "made retroactive" on habeas review new rules that implicated the fundamental fairness of a criminal proceeding and related to the accuracy of the underlying conviction, see, e.g., Teague v. Lane, 489 U.S. 288 (1989), and we assume Congress to have been aware of this practice. The Supreme Court's declaration in Sullivan v. Louisiana, 508 U.S. 275

(1993), that a Cage error represents a "structural defect" that effectively nullifies the prior proceeding indicates that the Cage rule satisfies these fundamental fairness and accuracy requirements.

In our view, even though Sullivan did not arise in the habeas context, it left no doubt as to how the Cage rule fits within retroactivity analysis. Indeed, prior to AEDPA's passage, several Courts of Appeals had found Cage available for retroactive application in habeas proceedings in light of Sullivan, largely obviating the Supreme Court's need to make a more explicit announcement (and rendering it less likely that there will ever be one). We believe that, in this setting, Teague retroactivity survives AEDPA's enactment, and we hold that the constitutional rule announced by Cage v. Louisiana has indeed been "made retroactive to cases on collateral review" within the meaning of 28 U.S.C. S 2244(b)(2)(A).

Even though we rule that West's petition survives the gatekeeping hurdle that the new rule must have been "made retroactive," we conclude that West cannot obtain the relief he seeks, for he clearly cannot prevail on the merits of his claim. The jury instruction in his case did not differ significantly from language that has been previously

3

approved of by this Court and the Supreme Court. We will therefore affirm the District Court's dismissal of West's habeas petition.1

I.

On July 15, 1983, a jury of the Philadelphia County Court of Common Pleas convicted petitioner West offirst-degree murder, criminal conspiracy, and possession of an instrument of crime. Prior to its deliberations, the jury received the following instruction on reasonable doubt from the trial judge, the Honorable Lisa Aversa Richette:

> Now, I just want to say that we have heard these words a great deal, the reasonable doubt phrase, and I think that all three lawyers did talk about reasonable doubt in a very intelligent and correct way. I think one of them, Mr. Voluck, even gave an example that I usually give, that one about going to look at a house and as you have seen all the specs on the house, it sounds magnificent, new copper tubing and all the rest. And as you are coming out of the house, you notice a very large stain on one wall which indicates some major kind of internal leak. You don't go racing back to the real estate office with a hefty down

payment. You pause and you hesitate because this is a matter of high importance to yourself. You know, buying a house is probably the largest single expenditure most of us make in our lifetime short of, God forbid, if we ever have incapacitating medical bills without medical insurance. But that's what you would do, you would pause and you would hesitate. And there are matters of high importance to all of us in our lives in which in evaluating the evidence that we are using to make that decision, we come up with the kind and quality of evidence that makes us pause and hesitate before we make a decision. Now, it is this kind of doubt that we are talking about in this case, in all criminal cases, the kind of substantial doubt that

_____

1. We express our appreciation to Anthony C.H. Vale, Esquire, who, pursuant to appointment by the court, represented Mr. West both ably and zealously.

4

makes people pause before they plunge into action that is going to involve some important interests on their part.

So think about the evidence completely. Do you have that kind of doubt about the defendants' guilt?

. . . .

What I was saying was that if you don't have this kind of doubt, then it is your duty to convict. Now, this doesn't mean to say that you should have no doubt, that you should be persuaded beyond all doubt because that is not Mr. McGill's burden. We said that earlier that there is -- there are almost no areas of human affairs in which there are no doubts. There is always a little edge of doubt somewhere. So we are not asking Mr. McGill to prove this case to you beyond a mathematical certainty, like an algebra or a calculus problem. What we are asking is that it be proved to you by the District Attorney beyond a reasonable doubt so that you don't have the kind of doubt that comes up in human affairs which makes a person pause and hesitate.

Now, this doubt, of course, has to arise from the evidence, not from your own suspicions or your own speculations or your own predispositions, but after considering the evidence if you have this doubt, then I say you have a duty to acquit.

App. 119-21 (emphasis added).

West received a life sentence. After exhausting his direct appeals in the Pennsylvania state courts, which resulted in the vacatur of his judgment of sentence as to his conviction for possessing an instrument of crime but left his other sentences undisturbed, he filed a federal habeas corpus petition that was denied on the merits on July 12, 1990, four months before the Supreme Court decided Cage v. Louisiana, 498 U.S. 39 (1990).

Cage held that jury instructions that equated reasonable doubt with "actual substantial doubt" and "grave uncertainty" in conjunction with language calling for "moral certainty" suggested a higher degree of doubt than allowed

5

by the reasonable doubt standard.[2] As a result, such instructions have the potential of allowing a conviction based on proof below the minimum required by the Due Process Clause. See id. at 41. Thereafter, in Sullivan v. Louisiana, 508 U.S. 275 (1993), the Court declared that harmless error analysis does not apply to an instruction that does not meet the rule articulated in Cage.[3]

On May 10, 1991, West filed a petition under Pennsylvania's Post Conviction Relief Act ("PCRA"), 42 Pa. C.S. S 9541 et seq. He alleged ineffectiveness of counsel at both the trial and appellate levels on the grounds that his attorneys failed to object to a jury charge that allegedly misdefined "reasonable doubt" as "substantial doubt." The trial court denied his petition on March 8, 1994, and the Pennsylvania Superior Court affirmed the ruling the following year.[4]

_____

2. The instruction in Cage provided:

> If you entertain a reasonable doubt as to any fact or element necessary to constitute the defendant's guilt, it is your duty to give him the benefit of that doubt and return a verdict of not guilty. Even where the evidence demonstrates a probability of guilt, if it does not establish such guilt beyond a reasonable doubt, you must acquit the accused. This doubt, however, must be a reasonable one; that is one that is founded upon a real tangible substantial basis and not upon mere caprice and conjecture. It must be such doubt as would give rise to a grave uncertainty, raised in your mind by reasons of the unsatisfactory character of the evidence or lack thereof. A reasonable doubt is not a mere possible doubt. It is an actual

>   substantial doubt. It is a doubt that a reasonable man can seriously

>   entertain. What is required is not an absolute or mathematical certainty, but a moral certainty.

Id. at 40 (emphasis in the original).

3. The standard for reviewing jury instructions for a Cage error is whether there is a reasonable likelihood that the jury applied the instruction in an unconstitutional manner. See Estelle v. McGuire, 502 U.S. 62, 72 & n.4 (1991). In making this evaluation, a reviewing court is to consider the instructions as a whole. See Victor v. Nebraska, 511 U.S. 1, 5 (1994).

4. West further contended that his attorneys failed to object to a faulty jury charge on the presumption of innocence. This claim was rejected. He raised this claim in his second pleaded habeas petition, but the District Court rejected it because West failed to present an argument that the issue involved either a new rule of constitutional law or new evidence and was therefore barred by 28 U.S.C. S 2244(b)(2). That ruling is not before us today.

6

West filed his second petition for federal habeas relief on April 1, 1997, raising the same issues as his PCRA petition, and arguing that the jury instructions he received violated Cage. Pursuant to 28 U.S.C. S 2244(b)(3)(C), a panel of this Court, after determining that West had made a prima facie showing that he met the requirements of S 2244(b)(2)(A), granted him permission to file a second claim on June 23, 1997. In so doing, the panel construed West's filing as requesting permission to file both due process and ineffective assistance of counsel claims.

In their argument before the magistrate judge to whom the case was assigned, the state appellees maintained that, notwithstanding our finding that West met the prima facie showing required to file a successive petition under S 2244, his petition was still barred by his failure to satisfy the terms of S 2244(b)(2). The magistrate judge agreed. He recommended that West's petition be dismissed with prejudice because West had failed to establish that Cage has been "made retroactive to cases on collateral review by the Supreme Court" as required by S 2244(b)(2)(A). The District Court adopted the recommendation and dismissed the petition with prejudice on July 28, 1998. We granted an application for a Certificate of Appealability under 28 U.S.C. S 2253(c)(2) and directed the parties to brief the issue of whether Cage has been "made retroactive to cases on collateral review by the Supreme Court" as required by S 2244(b)(2).

Our jurisdiction over this appeal from a final judgment of
the District Court for the Eastern District of Pennsylvania
stems from 28 U.S.C. S 1291 and 28 U.S.C.S 2253. The
District Court had jurisdiction over West's petition under
28 U.S.C. S 2254 and 28 U.S.C. S 1331. Our review of the
District Court's interpretation of AEDPA is plenary. See
DeSousa v. Reno, 190 F.3d 175, 180 (3d Cir. 1999) (citing
Idahoan Fresh v. Advantage Produce, Inc., 157 F.3d 197,
202 (3d Cir. 1998)).

II.

AEDPA amended 28 U.S.C. S 2244(b) to declare in
pertinent part:

    (2) A claim presented in a second or successive
    habeas corpus application under section 2254 that was
    not presented in a prior application shall be dismissed
    unless--

    (A) the applicant shows that the claim relies on a
    new rule of constitutional law, made retroactive to
    cases on collateral review by the Supreme Court, that
    was previously unavailable; or

    (B)(i) the factual predicate for the claim could not
    have been discovered previously through the exercise of
    due diligence; and

    (ii) the facts underlying the claim, if proven and
    viewed in light of the evidence as a whole, would be
    sufficient to establish by clear and convincing evidence
    that, but for constitutional error, no reasonable
    factfinder would have found the applicant guilty of the
    underlying offense.

West does not offer any newly discovered or innocence-
establishing facts, so our decision depends on
S 2244(b)(2)(A). Accordingly, we turn to the question on
which we directed briefing: whether the Supreme Court has
made the rule of Cage v. Louisiana retroactive for purposes
of collateral review.

A.

Were the Supreme Court to state explicitly that Cage is
retroactive on collateral review or retroactively apply Cage,
the issue would be resolved. West contends that the Court
has already retroactively applied Cage in Adams v. Evatt,
511 U.S. 1001 (1994), a pre-AEDPA case. There, in
considering a habeas petition, the Court of Appeals for the

Fourth Circuit ruled that Cage should not be applied retroactively. See Adams v. Aiken, 965 F.2d 1306, 1312 (4th Cir. 1992) ("Adams I"). In Adams v. Evatt ("Adams II"), the Supreme Court vacated the judgment with directions that the Court of Appeals reconsider the case in light of the Supreme Court's decision Sullivan v. Louisiana . See 511 U.S. 1001. On remand, the Court of Appeals altered its original conclusion and determined that Cage is available

8

for retroactive application. See Adams v. Aiken , 41 F.3d 175, 178-79 (4th Cir. 1994) ("Adams III").

West claims that the Supreme Court's granting of certiorari, vacatur of the appellate court's judgment, and remand to the Court of Appeals (a "GVR" order), effectively made Cage retroactive on collateral review, a conclusion buttressed by the Court of Appeals's changed decision after the GVR order. We need not tarry long over this argument. The Supreme Court has made clear that, though remand may indicate that intervening precedent is sufficiently analogous or decisive to compel re-examination, it is not a "final determination on the merits." Henry v. City of Rock Hill, 376 U.S. 776, 777 (1964). More recently, the Court has stated that, although GVR orders may be issued in situations where redetermination in light of intervening developments may decide the merits of a case, they require only "consideration" by the lower court and are not summary reversals. See Lawrence v. Chater, 516 U.S. 163, 167-68 (1996); see also Fontroy v. Owens, 23 F.3d 63, 66 (3d Cir. 1994); Hughes Aircraft Co. v. United States, 140 F.3d 1470, 1473 (Fed. Cir. 1998) ("Vacatur and remand by the Supreme Court, however, does not create an implication that the lower court should change its prior determination.").

In his reply brief, West concedes that "[i]n form, a GVR order may never be a final decision on the merits," but contends that "in substance, it sometimes is." Reply Br. at 2. We decline to engage in the parsing of Supreme Court intent necessary to breathe life into so abstract a contention. Whatever a GVR's order value as a predictor of the Court's position on a particular matter, we do not treat such an order as a dispositive ruling. See Rodriguez v. Superintendent, Bay State Correctional Ctr., 139 F.3d 270, 276 (1st Cir. 1998). Other than his attempt to rely on Adams, West offers no Supreme Court precedent that he claims explicitly states that the Cage rule is to be applied retroactively for purposes of S 2244 or applies the rule in such a manner. We are similarly unaware of such precedent.

B.

In determining which new rules of law are retroactive under AEDPA, we are, of course, bound by the statute's plain meaning. See Wilson v. United States Parole Comm'n, 193 F.3d 195, 198 (3d Cir. 1999) ("We must give the natural and customary meaning to the words, and if that is plain, our sole function is to enforce it according to its terms." (citing Caminetti v. United States, 242 U.S. 470, 485 (1917))). Unfortunately, as the Supreme Court itself has recognized, AEDPA is less than a masterpiece of clarity. See Lindh v. Murphy, 521 U.S. 320, 336 (1997) ("All we can say is that in a world of silk purses and pigs' ears, the Act is not a silk purse of the art of statutory drafting.").

1.

The plain meaning argument against Cage retroactivity is simply stated: If the Supreme Court has never explicitly applied the rule retroactively or stated that the rule so applies, a successive habeas corpus petition based on Cage is unavailable because Cage has not been"made retroactive." Several of our sister circuits have already employed this logic to exclude successive petitions based on Cage. See In re Smith, 142 F.3d 832, 835–36 (5th Cir. 1998); Rodriguez v. Superintendent, Bay State Correctional Ctr., 139 F.3d 270 (1st Cir. 1998); In re Hill, 113 F.3d 181 (11th Cir. 1997), or other "new" rules for which petitioners sought retroactive application, see Bennett v. United States, 119 F.3d 470 (7th Cir. 1997); In re Vial, 115 F.3d 1192 (4th Cir. 1997) (en banc).

We do not, however, share the view of these courts of appeals that Congress's directive is so clear. More specifically, we are not convinced that "made retroactive" deserves the restrictive gloss applied by these courts in construing the term. Although "made retroactive" obviously encompasses direct retroactive application of a rule by the Supreme Court or express statements to that effect, we doubt that those meanings exhaust the phrase. Had Congress intended to cabin AEDPA retroactivity in that manner, it could have employed more specific terminology. Terms such as "held retroactive" or "applied retroactively"

would have left no doubt as to Cage's retroactivity. Instead, Congress chose the broader verb "made," which includes among its many meanings to have "cause[d] to occur" and "cause[d] to be or become: put in a certain state or

condition." Webster's Third New International Dictionary 1363 (1966). A natural question, therefore, is whether there are alternative methods through which the Supreme Court could cause a rule to become retroactive.

Such an alternative existed when Congress passed AEDPA, through the framework created by Teague v. Lane, 489 U.S. 288 (1989). Teague established that federal courts may retroactively apply new rules of law on habeas petitions if the rules are "watershed rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding," Graham v. Collins, 506 U.S. 461, 478 (1993) (internal quotations omitted), that "alter our understanding of the bedrock procedural elements essential to the fairness of a proceeding."[5] Sawyer v. Smith, 497 U.S. 227, 242 (1990) (internal quotations omitted) (emphasis in the original); see also Bousley v. United States, 118 S. Ct. 1604, 1610 (1998) ("[U]nless a new rule of criminal procedure is of such a nature that `without [it] the likelihood of an accurate conviction is seriously diminished, there is no reason to apply the rule retroactively on habeas review.' " (quoting Teague, 489 U.S. at 313)).[6]

In Sullivan v. Louisiana, 508 U.S. 275 (1993), the Supreme Court made clear that the Cage rule involves procedural elements essential to the fundamental fairness and accuracy of a criminal proceeding. Sullivan declared that harmless error analysis does not apply to an

_____

5. Although Teague was a plurality opinion, the Teague rule has been applied in subsequent Supreme Court cases. See, e.g., O'Dell v. Netherland, 521 U.S. 151, 157 (1997).

6. There does not appear to be significant dispute over whether the Cage rule was indeed "new" law. See Rodriguez , 139 F.3d at 273–74 ("A string of federal appellate decisions have held that Cage announced a new rule of constitutional law, see, e.g., Adams v. Aiken, 41 F.3d 175, 178–79 (4th Cir. 1994) (Adams III); Nutter v. White, 39 F.3d 1154, 1157–58 (11th Cir. 1994); Skelton v. Whitley, 950 F.2d 1037, 1043–44 (5th Cir. 1992), and we see no principled basis for sundering this unbroken strand.").

11

instruction that was "essentially identical" to the one present in Cage. Id. at 277, 281. In so ruling, the Court classified denial of a right to a jury verdict beyond a reasonable doubt as a "structural defect" "without which a criminal trial cannot reliably serve its function."[7] Id. at 281. Harmless error analysis cannot apply to a jury instruction that violates Cage because the error is so fundamental that, effectively, there is no verdict for an appellate court to

review. See id. at 280.8

_____

7. The list of errors that are structural in quality is a limited one.

> [W]e have found an error to be "structural," and thus subject to
> automatic reversal, only in a "very limited class of cases." Johnson

> v. United States, 520 U.S. 461, 468, 117 S.Ct. 1544, 137 L.Ed.2d
> 718 (1997) (citing Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792,

> 9 L.Ed.2d 799 (1963) (complete denial of counsel); Tumey v. Ohio,
> 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927) (biased trial judge);
> Vasquez v. Hillery, 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598
> (1986) (racial discrimination in selection of grand jury); McKaskle v.
> Wiggins, 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984) (denial
> of self-representation at trial); Waller v. Georgia, 467 U.S. 39, 104
> S.Ct. 2210, 81 L.Ed.2d 31 (1984) (denial of public trial); Sullivan v.
> Louisiana, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993)
> (defective reasonable-doubt instruction)).

Neder v. United States, 119 S. Ct. 1827, 1833 (1999).

8. In discussing why the harmless error standard of Chapman v.
California, 386 U.S. 18 (1967), could not apply, the Court explained:

> Harmless-error review looks, we have said, to the basis on which
> "the jury actually rested its verdict." The inquiry, in other words,
> is not whether, in a trial that occurred without the error, a guilty
> verdict would surely have been rendered, but whether the guilty
> verdict actually rendered in this trial was surely unattributable to

> the error. That must be so, because to hypothesize a guilty verdict
> that was never in fact rendered--no matter how inescapable the
> findings to support that verdict might be--would violate the jury-
> trial guarantee.

> Once the proper role of an appellate court engaged in the
> Chapman inquiry is understood, the illogic of harmless-error review
> in the present case becomes evident. Since, for the reasons
> described above, there has been no jury verdict within the meaning
> of the Sixth Amendment, the entire premise of Chapman review is
> simply absent. There being no jury verdict of guilty-beyond-a-

12

Sullivan had a significant effect on the reception and interpretation of Cage for retroactivity purposes. Prior to Sullivan, several Courts of Appeals refused to apply Cage retroactively. See Adams I, supra; Skelton v. Whitley, 950 F.2d 1037, 1044-45 (5th Cir. 1992). Since then, however, the decisions have been monolithically in favor of retroactivity. See Humphrey v. Cain, 138 F.3d 552 (5th Cir. 1998) (en banc); Adams III, 41 F.3d at 179 ("[T]he rule that a constitutionally deficient reasonable doubt instruction violates the Due Process Clause satisfies Teague's second exception. It should be applied retroactively."); Nutter v. White, 39 F.3d 1154, 1158 (11th Cir. 1994) ("[H]ere we confront one of those rare instances where our interest in certainty is so clearly implicated that finality interests must be subordinated. In sum, together with Sullivan, Cage has reshaped our view of the importance of precise reasonable doubt instructions.").

Though this Court has, until now, reserved the issue, see Flamer v. Delaware, 68 F.3d 736, 756 n.25 (3d Cir. 1995) (en banc), it seems clear that, were we operating in the pre-AEDPA context, we would recognize Sullivan as compelling retroactive application of Cage to habeas petitions. A "structural" error so severe that it resists harmless error analysis because it effectively nullifies the guilty verdict, as Sullivan described a Cage error to be, see 508 U.S. at 279-80, must necessarily implicate the fundamental fairness of the proceeding in a manner that calls the accuracy of its

---

reasonable-doubt, the question whether the same verdict of guilty-beyond-a-reasonable-doubt would have been rendered absent the constitutional error is utterly meaningless. There is no object, so to speak, upon which harmless-error scrutiny can operate. The most an appellate court can conclude is that a jury would surely have found petitioner guilty beyond a reasonable doubt--not that the jury's actual finding of guilty beyond a reasonable doubt would surely not have been different absent the constitutional error. That is not enough. The Sixth Amendment requires more than appellate speculation about a hypothetical jury's action, or else directed verdicts for the State would be sustainable on appeal; it requires an actual jury finding of guilty.

Id. at 279-80 (citations omitted) (emphasis in the original).

outcome into doubt.[9] See Graham v. Collins, 506 U.S. 461, 467 (1993); see also Sullivan, 508 U.S. at 285 (Rehnquist, C.J., concurring) ("A constitutionally deficient reasonable doubt instruction will always result in the absence of `beyond a reasonable doubt' jury findings.").

2.

We must, however, decide if AEDPA eliminates traditional Teague retroactivity analysis for pre-AEDPA decisions by the Supreme Court. We conclude that precedent that makes clear that a new constitutional rule fits the Teague retroactivity exception suffices to make a rule retroactive for purposes of successive habeas petitions under AEDPA. This is so even if the pronouncements are not made in the context of an actual retroactive application of the new rule on habeas review.

In so doing, we assume that when Congress passed AEDPA, it was aware of then-current practices in the courts vis-a-vis retroactivity. See Cannon v. Univ. of Chicago, 441 U.S. 677, 696-97 (1979) ("It is always appropriate to assume that our elected representatives, like other citizens, know the law."); Sandoval v. Reno, 166 F.3d 225, 235 (3d

_____

9. As a panel of the Court of Appeals for the Fifth Circuit explained in Humphrey v. Cain, 120 F.3d 526, 529 (5th Cir. 1997) in the context of allowing retroactive application of Cage on a first petition of habeas corpus:

> In our view, the Supreme Court has made it plain that Cage-Victor errors fit with the second Teague exception. The Court in Sullivan v. Louisiana, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993), explained that denying the right to a jury verdict beyond a reasonable doubt is a structural defect. Such an error takes away a " `basic protectio[n]' whose precise effects are unmeasurable, but without which a criminal trial cannot reliably serve its function." Id. at 281, 113 S.Ct. at 2083. In other words, a jury that purports to convict based on a constitutionally defective reasonable-doubt instruction has in fact not rendered any conviction at all.

The panel was unable to apply Cage retroactively because of prior precedent, but its discussion of the issue was the basis of the en banc court's decision to make Cage retroactive for Teague purposes. See Humphrey v. Cain, 138 F.3d 552, 553 (5th Cir. 1998) (en banc).

14

Cir. 1999) (declaring Congress aware of relevant court precedents in enacting AEDPA). At the time of AEDPA's

passage, Congress knew that new constitutional rules were retroactively applicable to habeas petitions if the Supreme Court declared them to be of a certain quality. Congress did not explicitly alter this mechanism and chose language consistent with then-contemporary practice instead of a more restrictive formulation.10 We are therefore satisfied that the language in Sullivan v. Louisiana that describes the violation in Cage as structural suffices to establish Cage's retroactivity.

Our reasoning is bolstered by the fact that Sullivan's clarity obviated the need for the Supreme Court to make a future, more explicit, pronouncement on whether Cage should be applied retroactively. In practical terms, Sullivan choked off the flow of cases in which an explicit pronouncement might be necessary. As federal courts follow the Supreme Court's lead, see, e.g., Adams III, 41 F.3d at 178-79; Nutter, 39 F.3d at 1158, there will be no reason to make matters explicit, as the issue will not reach the Supreme Court on appeal when retroactivity was obvious. Adams II appears the rare case in which the Court had a chance to address the issue, but it remanded in light of the relative freshness of Sullivan to give the court of appeals an opportunity to pass on the issue itself. Though the GVR order in Adams II is not a retroactive application of Cage, see supra Part II.A, it is quite persuasive on the question of Sullivan's applicability to the Cage retroactivity issue notwithstanding the fact that Sullivan arose on a direct appeal.

We acknowledge that other courts have taken a different view on retroactivity under AEDPA. See, e.g., In re Vial, 115 F.3d 1192 (4th Cir. 1997) (en banc). In Vial, the court ruled that for purposes of a S 2255 motion, which has the same

_____

10. Of course, Congress did indeed narrow the range of retroactive constitutional rules by restricting the range of new rules to those made retroactive by the Supreme Court in particular and not federal courts in general. The question is not whether only the Supreme Court can make a new rule retroactive, but how that retroactivity is expressed. We find no indication that AEDPA eliminated the role of the lower federal courts in interpreting the effect of Supreme Court pronouncements.

15

statutory retroactivity standard as a S 2244 motion, "we conclude that a new rule of constitutional law has been `made retroactive to cases on collateral review by the Supreme Court' within the meaning of S 2255 only when the Supreme Court declares the collateral availability of the rule in question, either by explicitly so stating or by applying the rule in a collateral proceeding." Id. at 1197.

The court refused to interpret "made retroactive" as encompassing situations in which Supreme Court precedent establishes "that the new rule is of the type available to those proceeding on collateral review," because it viewed such an approach as contrary to the plain language of S 2255. Id. at 1196.

As discussed above, we differ on what a plain language approach compels in this case. We note also that the Fourth Circuit acknowledged that, prior to AEDPA, the Supreme Court had no reason to be more explicit in its pronouncements on retroactivity. "Of course, it seems unlikely that the Supreme Court would grant certiorari to declare the applicability of a rule announced on direct review to collateral proceedings when . . . lower federal courts uniformly rule in favor of collateral availability." Id. at 1196 n.8. A consequence of the Fourth Circuit approach, therefore, would be to preclude habeas review for claims most clearly deserving of retroactive application. In the absence of more specific language, we do not think this was Congress's intention in passing AEDPA.

For all of these reasons, we hold that Cage claims have been "made retroactive" for purposes of 28 U.S.C. S 2244(b)(2)(A).

III.

In holding that Cage claims are available for retroactive application under AEDPA, we do not rule that West is entitled to the relief he seeks. Several issues stand between West and a favorable judgment on the merits. First, though West's initial petition for habeas relief raised only issues of ineffective assistance of counsel, a panel of this Court construed West's request as including both ineffective assistance and due process claims. The question remains

16

whether a due process claim has met exhaustion requirements and whether it has been procedurally defaulted. Another potential issue is whether the claim was "previously unavailable" for purposes of AEDPA, see S 2244(b)(2)(A), or if West still should have raised his due process claims in earlier proceedings notwithstanding the fact that the Supreme Court had as yet not announced the Cage rule.11

We might determine these issues in the first instance or remand them to the District Court. Alternatively, we may exercise our ability to dispose of habeas cases adversely to a petitioner regardless of considerations of exhaustion if the merits are clearly against the petitioner. See 28 U.S.C.

S 2254(b)(2); Granberry v. Greer, 481 U.S. 129, 135 (1987). Such a disposition appears in order here, as West cannot prevail under either an ineffective assistance or a due process claim regardless of the resolution of the procedural issues. Whatever the soundness of the procedural foundation of his habeas petition, it is fatally weak at its substantive core, for there was simply no constitutional defect at West's trial.

The portion of the jury instruction at issue in this case does not appear to differ significantly from an instruction that we approved in Flamer v. Delaware, 68 F.3d 736 (3d Cir. 1995). In Flamer, this Court, sitting en banc, held that refusing, on grounds of procedural default, to review a jury instruction that contained a sentence equating substantial doubt and reasonable doubt would not constitute a miscarriage of justice because the instruction was similar to one approved of by the Supreme Court. The challenged instruction stated:

> Reasonable doubt does not mean a vague, speculative or whimsical doubt, nor a mere possible doubt, but a substantial doubt and such a doubt as intelligent, reasonable and impartial men and women may honestly entertain after a careful and conscientious consideration of the evidence in the case.

Id. at 757 (emphasis in original). We stated that
_____

11. The state appellees do not raise this issue.

notwithstanding the equation of substantial doubt to a reasonable doubt, the instruction "contrasted a`substantial doubt' with `a doubt arising from a mere possible doubt,' `a vague, speculative' doubt, and a `whimsical doubt.' " Id. at 757. Similar use of the term "substantial doubt" was approved by the Supreme Court in Victor v. Nebraska, 511 U.S. 1 (1994).

Addressing this issue at oral argument, West's counsel offered arguments seeking to distinguish the instructions at issue here from those in Flamer by noting that the instructions by the trial judge did not similarly contrast substantial doubt with a merely speculative or fanciful doubt, thereby leaving the implication that the term "substantial" was used in the sense of connoting a large amount, rather than the acceptable "not imaginary." We are unpersuaded. We bear in mind that jury instructions are to be considered as a whole. "[T]he Constitution does not require that any particular form of words be used in

advising the jury of the government's burden of proof. Rather, taken as a whole, the instructions [must] correctly conve[y] the concept of reasonable doubt to the jury." Victor, 511 U.S. at 5 (citations and quotations omitted). West's instructions went beyond the statement concerning substantial doubt and further defined the term "reasonable doubt:"

> Now, it is this kind of doubt that we are talking about in this case, in all criminal cases, the kind of substantial doubt that makes people pause before they plunge into action that is going to involve some important interests on their part.

> . . .

> What we are asking is that it be proved to you by the District Attorney beyond a reasonable doubt so that you don't have the kind of doubt that comes up in human affairs which makes a person pause and hesitate.

App. 119-21 (emphasis added).

In Victor, the Supreme Court stated that even though the instruction at issue was not a constitutional violation

because it contrasted substantial doubt with a fanciful conjecture, "[i]n any event, the instruction provided an alternative definition of reasonable doubt: a doubt that would cause a reasonable person to hesitate to act. This is a formulation we have repeatedly approved." Victor, 511 U.S. at 20.12 The Court concluded that such an instruction is not likely to mislead a jury. "[T]o the extent the word `substantial' denotes the quantum of doubt necessary for acquittal, the hesitate to act standard gives a common sense benchmark for just how substantial such a doubt must be." Id. at 20-21. It is clear that that is precisely what the jury instruction in West's case did. Therefore, although a sentence that appears to equate reasonable doubt and substantial doubt is problematic, see id. at 19, such a statement used one time in an otherwise unobjectionable charge does not render the instruction constitutionally suspect as a whole.13

_____

12. The instruction at issue in Victor was as follows:

> "Reasonable doubt" is such a doubt as would cause a reasonable and prudent person, in one of the graver and more important transactions of life, to pause and hesitate before taking the

represented facts as true and relying and acting thereon. It is such

a doubt as will not permit you, after full, fair, and impartial consideration of all the evidence, to have an abiding conviction, to a

moral certainty, of the guilt of the accused. At the same time, absolute or mathematical certainty is not required. You may be convinced of the truth of a fact beyond a reasonable doubt and yet be fully aware that possibly you may be mistaken. You may find an accused guilty upon the strong probabilities of the case, provided such probabilities are strong enough to exclude any doubt of his guilt that is reasonable. A reasonable doubt is an actual and substantial doubt reasonably arising from the evidence, from the facts or circumstances shown by the evidence, or from the lack of evidence on the part of the State, as distinguished from a doubt arising from mere possibility, from bare imagination, or from fanciful conjecture.

Id. at 18 (emphasis in the original).

13. In his argument before the District Court, West also maintained that the trial judge's example of a stain indicating"some major kind of leak" in a house that prompted hesitation in a buyer also served to dilute the reasonable doubt standard. The state appellees claim that West failed to

19

properly raise the issue in state proceedings. We think it clear, however, that the hypothetical in the jury instruction was drawn to give context to the court's explanation of what the meaning of hesitation to act is, and that the word "major" was not equated to "major doubt" or the like. In this context, the instruction was unobjectionable.
We therefore conclude that West is unable to prevail on
the merits. Accordingly, we decline to consider the other,
unresolved, issues that could potentially preclude review of
his Cage claim.

For the foregoing reasons, we will affirm the District
Court's order dismissing West's habeas petition.

A True Copy:
Teste:

Clerk of the United States Court of Appeals
for the Third Circuit

20